IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| AHMAD R. SHAYESTEH,<br><br>        Plaintiff,<br><br>v.<br><br>CENTRAL BANK et al.,<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:04-CV-488-CW<br><br>District Judge Clark Waddoups |

Plaintiff, Ahmad R. Shayesteh, an inmate at the Federal Correctional Institution in Fort Dix, New Jersey, filed this lawsuit *pro se* and *in forma pauperis* under 28 U.S.C. § 1915. *See* 28 U.S.C.A. § 1915(b) (West 2009). Before the court are Plaintiff's motion to strike portions of Defendants' summary judgment evidence and Plaintiff's and Defendants' cross-motions for summary judgment.

## ANALYSIS

**I.    Plaintiff's Motion to Strike**

Plaintiff moves to strike certain evidence supporting Defendants' motion for summary judgment. First, Plaintiff challenges the admissibility of exhibits "I" and "G" to Defendants' memorandum supporting summary judgment. (Doc. no. 127.) Exhibit I is a Presentence Report prepared by the United States Probation and Pretrial Services Office in relation to Plaintiff's criminal conviction in 1995. Exhibit G is a Personal Financial Statement prepared by Pretrial Services and signed by Plaintiff in connection with the same criminal prosecution. Plaintiff

asserts that both these items are protected under DUCrimR 32-1 and that they were illegally obtained and disseminated by Defendants without permission from the court. Plaintiff requests that these items be stricken from the record and that sanctions be imposed upon Defendants for wrongfully disseminating protected information.

Plaintiff's arguments regarding Exhibits I and G are unpersuasive. As pointed out by Defendants, these items were the subject of a motion to compel discovery filed by Defendants on July 10, 2006. (Doc. no. 50.) In an Order entered November 30, 2006, the court held that "[Plaintiff's] criminal history and ancillary documents are discoverable from 1993 forward." (Doc. no. 76 at 9.) Despite Plaintiff's arguments to the contrary, Exhibits I and G are ancillary documents related to Plaintiff's criminal history since 1993 and fall squarely within the language of the court's previous discovery order. Moreover, Rule 32-1(c) of the local criminal rules permits release of such records by order of the court. S*ee* DUCrimR 32-1. Accordingly, Exhibits I and G are admissible and no sanctions are warranted against Defendants.

Next, Plaintiff challenges the admissibility of Exhibit H to Defendants' supporting memorandum, which is a transcript of Plaintiff's deposition taken on November 9, 2007.[1] (Doc. no. 127, Ex. H.) Plaintiff asserts that the complete deposition transcript is inadmissible because it includes questions and answers which Plaintiff asserts are irrelevant to this case and "needlessly delv[e] into [Plaintiff's] private affairs and information." (Pl.'s Reply Defs.' Opp'n

---

[1] The original Exhibit H submitted by Defendants mistakenly included only the even-numbered pages of the deposition transcript, however, Defendants subsequently filed an Amended Exhibit H (doc. no. 125.) which includes the complete transcript.

Mot. Strike at 3.) Plaintiff also challenges specific references to the deposition transcript made in Defendants' supporting memorandum.

After reviewing the complete transcript and Plaintiff's objections the court finds no basis to strike the entire deposition or any of Defendants' specific references thereto. The court previously considered and rejected Plaintiff's blanket objection to the deposition in its Order Denying Plaintiff's Motion to Vacate, entered September 22, 2008. (Doc. no. 111.) Moreover, Plaintiff has not offered any legal support for his assertion that an entire deposition is inadmissible for summary judgment purposes if any portion of it "needlessly delves into the deponent's private affairs or information." Nor has Plaintiff demonstrated that any of the specific references by Defendants to the deposition transcript are irrelevant. In fact, Defendants have clearly demonstrated the relevance of each of the cited portions of the deposition. (Doc. no. 134, Defs.' Opp'n Pl.'s Mot. Strike.) Thus, Plaintiff's motion to strike the deposition transcript or any references thereto is denied.

Finally, Plaintiff moves to strike the Affidavit of Gary Jensen dated December 8, 2003 ("2003 Affidavit"), which is attached as Exhibit B to Defendants' memorandum supporting summary judgment.[2] (Doc. no. 127, Ex. B.) Plaintiff asserts that the 2003 Affidavit is

---

[2] On July 2, 2009, prior to filing of Plaintiff's motion to strike, Defendants submitted another Affidavit of Gary Jensen ("2009 Affidavit") which includes some, but not all, of the statements made in the 2003 Jensen Affidavit, as well as some additional statements relevant to Defendants' summary judgment motion. Although Plaintiff does not point out any inconsistencies between these two affidavits, Plaintiff asserts that the failure to repeat each and every statement from the 2003 Affidavit in the 2009 Affidavit suggests some of Jensen's earlier statements may have been false, and that Jensen avoided repeating them so as not to perjure himself. The Court finds no support for this conjecture. As demonstrated by the timing of the

inadmissible because it was executed over six years ago, while the limitations period for perjury is only five years.  Although Defendants have not directly addressed Plaintiff's perjury argument, Defendants contend that the 2003 Affidavit is admissible based on a ruling by the Honorable David Sam in related forfeiture proceedings.  *See United States v. $72,1000.00 in United States Currency*, Civil No. 2:03-CV-140-DS.  In that case, Plaintiff moved to strike the 2003 Affidavit on other grounds and the court denied the motion stating: "The court is satisfied that the relevant portions of the [Jensen] affidavit present admissible evidence and Shayesteh's motion is summarily denied."  *See Id.*, doc. no. 46 at 5.  Based on this prior decision Defendants contend Plaintiff is now collaterally estopped from objecting to the 2003 Affidavit.

     Plaintiff does not cite any legal authority for his contention that an affidavit previously admitted into evidence becomes inadmissible for purposes of subsequent litigation once the limitations period for perjury has expired.  Plaintiff cannot dispute that the 2003 Affidavit was executed under penalty of perjury, that it contains evidence relevant to the case at bar, and that it was previously deemed admissible in evidence.  Moreover, by resubmitting the 2003 Affidavit in support of the present motion, Mr. Jensen reaffirms his intent for the court to rely upon it and subjects himself to penalty for submitting false statements previously sworn under oath to be true.  Thus, the Court finds Plaintiff's objection to Jensen's 2003 Affidavit to be without merit and the motion to strike it is denied.

---

2009 affidavit and Defendants' estoppel argument, the 2009 Jensen Affidavit is intended to supplement, not supercede, the earlier one.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986). Thus, Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move "with or without supporting affidavits for a summary judgment in the party's favor upon all or any part of [a claim]." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Federal Rule of Civil Procedure 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant

"must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

## III. Factual Record

The material facts in this case are essentially undisputed, however, wherever discrepancies do exist the evidence is viewed in the light most favorable to Plaintiff.[3]

On January 25, 1995, Plaintiff rented a safe-deposit box from Central Bank in Provo, Utah. Plaintiff alleges that he placed in the box a family heirloom consisting of "382 ingeniously-cut, multifaceted, brilliantly-polished, white, D-flawless diamonds(each weighing between 1 and 2.3 carats." (Compl. ¶ 11.) Plaintiff alleges that between December 1994 and May 1995 he also placed $80,000 in U.S. currency in the safe-deposit box. The last time Plaintiff accessed the safe-deposit box was in May of 1995. In June 1995 Plaintiff was charged in a two count indictment with possession of a controlled substance with intent to distribute. The charges stemmed from a consent search of Plaintiff's vehicle which turned up 632 grams of cocaine and approximately 2,000 grams of methamphetamine. In August 1996 Plaintiff was convicted on both counts, sentenced to 262 months in prison, and assessed a $10,000 fine.

---

[3] Despite challenging the admissibility of Defendants' evidence, Plaintiff has not produced his own admissible evidence showing a genuine dispute as to the essential facts presented here. Moreover, many of the so-called "undisputed facts" presented by Plaintiff are merely speculation and are excluded as immaterial or lacking evidentiary support.

Plaintiff has been continuously incarcerated since May 29, 1995.

In the Spring of 2002, Central Bank compiled a list of bank accounts which were suspected abandoned and, therefore, subject to escheatment to the State of Utah. Among the identified accounts was a checking account under the name "Ahmad R. Shayestah" which had been inactive for seven years. Garry Jensen, a bank employee, investigated the account and discovered that Central Bank also held a savings account and safe-deposit box under the name of "Ahmad Shayestah."[4] Bank statements sent to Plaintiff at the address on file had been returned undelivered by the United States Postal Service. Mr. Jensen attempted to locate Plaintiff through a credit bureau search using the Social Security number provided by Plaintiff on bank documents but discovered that the number belonged to a woman residing in Minnesota. Based on his investigation Jensen determined that the bank accounts were abandoned and subject to escheatment. On April 29, 2002, the balance of Mr. Shayesteh's savings and checking accounts at Central Bank ($9,459.03 on that date) escheated to the State of Utah and the accounts were closed.

On or about May 2, 2002, Central Bank hired a locksmith, Steve Roden, to "drill" into Plaintiff's safe-deposit box in order to determine its contents. Roden was observed by Mr. Jensen, Dave McBeth, and an unidentified female bank employee. Inside the safe-deposit box bank officials found several sealed, labeled envelopes. Hoping to find information which might lead them to Mr. Shayesteh they opened an envelope labeled "No. 1" and found inside

---

[4]Notwithstanding the different spelling, Plaintiff asserts by bringing this action that he was the owner of the safe-deposit box.

approximately $16,000 in cash, all in small bills.  The envelope labeled "No. 1" also contained other manila envelopes.  Jensen subsequently opened another envelope labeled "F," which was not bulky, and found an ATM card inside.  Based on the appearance of the other unopened envelopes Jensen assumed that they probably contained additional currency.  Jensen has testified that he did not observe any envelopes that had the shape or feel of envelopes with diamonds in them.  At this point all the envelopes, along with their contents, were put back into the safe-deposit box and the box was resealed.

      On May 17, 2002, Central Bank contacted the FBI and notified them about the safe-deposit box.  Bank officials also provided the FBI with information about Plaintiff and his accounts.  Central Bank was subsequently informed by the FBI that in 1996 Mr. Shayesteh was convicted on drug-related criminal charges and was currently in prison.  On or about September 4, 2002, a seizure warrant for the contents of the safe-deposit box was issued and served upon Central Bank.  Pursuant to the warrant, the safe-deposit box was seized and its contents were inventoried.  The box was found to contain a total of $72,100 in cash and no diamonds or other valuables.

      On February 5, 2003, the United States of America filed a Verified Complaint for Forfeiture *In Rem* ("Forfeiture Suit") against the seized currency in the U.S. District Court for the District of Utah.  *See United States v. $72,100 in United States Currency*, Case No. 2:03-CV-140-DS.  Plaintiff intervened in that action by filing a Verified Answer to the Complaint for Forfeiture.  Plaintiff also filed a Verified Counter-Complaint asserting that at the time the safe-deposit box was forcibly opened by Central Bank it actually contained $80,000 in currency and

diamonds with a wholesale value of approximately $4,000,000.  Plaintiff's counter-complaint further alleged that FBI agents were present and/or participated in, or encouraged, the initial search of the safe-deposit box, making them liable for the alleged loss of the additional $8,900 in currency and the diamonds.  On September 17, 2004, Plaintiff's counter-complaint was dismissed by the Honorable David Sam who stated, "[t]here is no viable claim that the alleged diamonds and additional currency were seized for the purposes of forfeiture.  Moreover, Shayesteh stands convicted of a crime which, assuming the alleged property were present, would necessarily be grounds for any forfeiture seizure."  *See United States v. $72,100 in United States Currency*, Case No. 2:03-CV-140-DS, Doc. no. 46 at 4-5.

On May 28, 2004, Plaintiff filed the present suit against Central Bank, Central Bancorporation, Gary Jensen, Dave McBeth and Steve Roden (Defendants).  Plaintiff's Complaint asserts one claim under the Right to Financial Privacy Act of 1978, *see* 12 U.S.C.A. §§ 3401-3422 (West 2009), and numerous state law claims.  Plaintiff seeks actual damages of $4,097,000 and punitive damages of $10,000,000.

## IV. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on two grounds.  First, Defendants assert that Plaintiff's claims are barred under the doctrine of judicial estoppel based on prior inconsistent statements made by Plaintiff in unrelated legal proceedings.  Second, Defendants assert immunity under Section 351 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), which gives financial institutions immunity for disclosures of financial information under certain circumstances.  The Court addresses each of these arguments in turn.

### A. Judicial Estoppel

The Tenth Circuit recently elucidated the doctrine of judicial estoppel, stating:

> The doctrine of judicial estoppel is based upon protecting the integrity of the judicial system by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." Though there is no precise formula, in order to determine whether to apply judicial estoppel, courts typically inquire as to whether: 1) a party's later position is clearly inconsistent with its earlier position; 2) a party has persuaded a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled" and 3) the party seeking to assert the inconsistent position would derive an unfair advantage if not estopped.

*Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008) (citations omitted).

Defendants put forth two theories for judicial estoppel here. First, Defendants argue that Plaintiff previously asserted in other litigation that the FBI and DEA were responsible for the same losses alleged in this suit, thereby undermining Plaintiff's present claim that Defendants were responsible. As noted by Plaintiff, however, the Court has repeatedly rejected Defendants' argument that Plaintiff's claims against the FBI and DEA preclude a finding of liability against the present Defendants. As previously explained, Plaintiff's claims against the FBI and DEA were merely alternative theories of liability which would not preclude holding Defendants liable as joint-tortfeasors. Because these alternative theories are not inconsistent with Plaintiff's present claims they are not a valid basis for judicial estoppel.

Defendants' second ground for estoppel is based on Plaintiff's assertions of indigence in prior litigation. Specifically, Defendants contend that Plaintiff previously asserted in at least two prior legal proceedings that he was indigent, directly contradicting his present claim that he held diamonds and cash worth $4,080,000 in a safe-deposit box.

The first legal proceeding cited by Defendants in which Plaintiff claimed to be indigent was a 1995 prosecution for misdemeanor assault in the Justice Court of the City of South Salt Lake, Salt Lake County, State of Utah. There, Plaintiff asserted his indigence and requested appointment of counsel. The Justice Court denied counsel on the ground that Plaintiff was only charged with a misdemeanor. Plaintiff was convicted on April 12, 1995.[5] *See Shayesteh v. City of South Salt Lake*, 217 F.3d 1281 (10th Cir. 2000.)

Although from the scant record it does appear that Plaintiff claimed indigence in the Justice Court proceeding, it is not clear that there was any judicial reliance on that assertion. In fact, as Plaintiff's subsequent appeals showed, the Justice Court erroneously declined to appoint counsel for Plaintiff. *Id*. Thus, the Court finds that Plaintiff's assertion of indigence in the Justice Court proceeding is not sufficient grounds for estoppel here.

The next judicial proceeding cited by Defendants, in which Plaintiff asserted indigence, was on direct appeal of his federal drug conviction to the Tenth Circuit Court of Appeals. *See United States v. Shayesteh*, No. 97-4111, 161 F.3d 19 (10th Cir. 1998). There, Plaintiff requested leave to proceed *in forma pauperis* on appeal and his request was granted by this court on July 28, 1997. Plaintiff's assertion of indigence in his direct appeal clearly contradicts his present

---

[5] Plaintiff subsequently challenged this conviction in a habeas corpus petition filed in this court and his petition was denied. *See Shayesteh v. City of South Salt Lake*, case no. 2:97-CV-504-DB. On appeal, the Tenth Circuit vacated the prison sentence and probationary period imposed by the Justice Court but affirmed Plaintiff's conviction and the remainder of his sentence. *See Shayesteh v. City of South Salt Lake*, 217 F.3d 1281 (10th Cir. 2000.) The facts presented here regarding the Justice Court proceedings are drawn from the Tenth Circuit's appellate decision.

claim that from the time of his arrest until May 2002 he held $4,080,000 worth of cash and diamonds in a safe-deposit box at Central Bank.[6]

The evidence presented by Defendants, as well as other court records subject to judicial notice, also show that Plaintiff persuaded the court to accept his earlier position. In the order granting Plaintiff's request to proceed *in forma pauperis* on appeal the Honorable David Sam stated: "Defendant having been found by this this [sic] Honorable Court to be indigent on or about July 1, 1997 in open court, and good cause appearing therefore, IT IS HEREBY ORDERED that Defendant be and hereby is granted leave to appeal *in forma pauperis*." *United States v. Shayesteh*, No. 95-CR-106-S, Doc. no. 89 (entered July 28, 1997). Allowing Plaintiff to proceed with his present claims, which are founded on the allegation that Plaintiff actually held millions of dollars worth of assets in a safe-deposit box at the time he induced the court to allow him to proceed *in forma pauperis*, would undoubtedly create the perception that the court was previously misled.

Finally, the Court finds that Plaintiff would derive an unfair advantage in this litigation if not estopped from contradicting his prior sworn statements. Despite subjecting Defendants to over five years of costly litigation, including extensive discovery, Plaintiff has not produced any evidence besides his own self-serving statements to support his allegation that there was additional money or diamonds in the seized safe-deposit box. Allowing this case to proceed to

---

[6] In his deposition testimony Plaintiff states that he placed the money and diamonds in the box between December 1994 and May 1995 and that he has been continuously incarcerated since May 29, 1995.

trial based solely on Plaintiff's testimony, while overlooking Plaintiff's prior contradictory statements which were relied upon by the court, would clearly give Plaintiff an unfair advantage in this litigation.

Plaintiff seeks to avoid estoppel here by arguing that "common sense would dictate that the law could not allow a third party to rob a person because that person may not have been totally forthcoming in matters unrelated to the said third party in the past." (Pl.'s Mem. Opp'n Summ. J. at 6.)  This self-serving characterization is not only misguided, it is also tantamount to an admission that Plaintiff intentionally misled the court with his previous assertion of indigence. Contrary to Plaintiff's legal intuition, however, Plaintiff's failure to be "totally forthcoming" is precisely the type of fraud on the court which the doctrine of judicial estoppel was designed to address.

Based on Plaintiff's assertion of indigence made before the Honorable David Sam on July 1, 1997, in open court, Plaintiff is hereby estopped from pursuing damages for the loss of any property Plaintiff allegedly held, but failed to disclose, on that date.  Thus, Defendants are entitled to summary judgment on Plaintiff's claim for damages stemming from the loss of money and diamonds allegedly held in the safe-deposit box at Central Bank.

### B       Right to Financial Privacy Act (RFPA)

In addition to his claims for compensatory damages, Plaintiff's Complaint also asserts a separate claim for violation of the Right to Financial Privacy Act of 1978.  *See* 12 U.S.C.A. §§ 3401-3422 (West 2009).  Specifically, Plaintiff alleges that Defendants violated § 3403 of the RFPA, which deals with the confidentiality of financial records, by informing the FBI about the

existence of Shayesteh's safe-deposit box and bank accounts.  Plaintiff further alleges that the disclosures to the FBI were motivated by bias against Plaintiff's Iraninan nationality stemming from the terrorist attacks on September 11, 2001.

Defendants move for summary judgment on Plaintiff's RFPA claim on the ground that they are entitled to immunity under the safe harbor provision found in § 351 of the USA PATRIOT Act, which is codified at 31 U.S.C. § 5318.  Section 5318(g)(3)(A) states:

> Any financial institution that makes a *voluntary disclosure* of *any possible violation* of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, *shall not be liable* to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

31 U.S.C.A. § 5318(g)(3)(A) (West 2009)(emphasis added).

Plaintiff asserts that the USA PATRIOT Act's safe harbor provision does not apply in this case because the disclosures here occurred prior to its effective date.[7]  Plaintiff does concede, however, that an earlier version of the safe harbor provision included in the Annunzio-Wylie Anti-Money Laundering Act, *see* Pub. L. 102-550, 106 Stat. 4059 (Oct. 28, 1992)(codified at 31

---

[7] Defendants have not addressed this argument, however, it is undisputed that the initial disclosures to the FBI occurred on May 17, 2002, while the relevant provision of the USA PATRIOT Act became effective on October 26, 2001.  Thus, the version of § 5318(g)(3) as amended by the USA PATRIOT Act is applicable here.

U.S.C. § 5318), is applicable to this case.[8]  Although there are slight differences between the earlier version acknowledged by Plaintiff and the more recent version cited by Defendants, Plaintiff has not identified any language in either version which would clearly place Defendants' disclosures outside the statutory safe harbor.

Plaintiff also cites a provision in the Code of Federal Regulations which requires a "member bank" to file a Suspicious Activity Report (SAR) "when it detects a known or suspected violation of Federal law, or a suspicious transaction related to a money laundering activity or a violation of the Bank Secrecy Act."  12 C.F.R. § 208.62 (2009).  Although Plaintiff asserts that Defendants neglected to submit a SAR as required under this regulation, Plaintiff has not shown that failure to submit a SAR strips a disclosing party of protection under § 5318's safe harbor provision.  While the regulation states that failure to submit a SAR "may subject" a financial institution or others "to supervisory action," it says nothing about denying safe harbor protection.  12 C.F.R. § 208.62(I) (2009).  In fact, the regulation specifically reiterates that the safe harbor provision of § 5318 "covers *all* reports of suspected or known criminal violations and suspicious activities to law enforcement . . . *regardless of whether such reports are filed*

---

[8]  The safe harbor provision contained in the Annunzio-Wylie Anti-Money Laundering Act, states:
> Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

31 U.S.C. § 5318(g)(3)(1992).

*pursuant to this section or are filed on a voluntary basis*." 12 C.F.R. § 208.62(k) (2009) (emphasis added).

Having concluded that the safe harbor provision is applicable here, the Court must now decide whether the disclosures made by Defendants fell within the protection of the statute. There is ample evidence in the record to support Defendants' contention that their disclosures to the FBI were not motivated by racial other bias but were intended merely to report "a possible violation of law," as permitted under § 5318(g)(3). Prior to contacting the FBI, Defendants had already determined that the name and Social Security number given by Plaintiff to Central Bank were incorrect. In addition, Plaintiff had not accessed the safe-deposit box for nearly seven years, and all efforts to contact Plaintiff at the address on file were unsuccessful. Finally, Defendants had already opened the safe-deposit box according to bank policy and found it to contain a large quantity of cash, in small bills, with no further information regarding the identity or whereabouts of the owner. Under these circumstances Defendants justifiably determined there was sufficient evidence of a possible violation of law to warrant disclosure to law enforcement.

Because Defendants disclosures to the FBI were directly relevant to reporting a possible violation of law they fall squarely within the safe harbor provision found in 31 U.S.C. § 5318. Thus, Defendants cannot be held liable for their disclosures under the RFPA and they are entitled to summary judgment on this claim.

### C. State Law Claims

Plaintiff's Complaint also asserts state law claims against Defendants for trespass, conversion, negligence, breach of contract, breach of fiduciary duty, and breach of bailment

agreement.  As previously discussed, any damages sought by Plaintiff on these claims for loss of property allegedly held on July 1, 1997, are barred by judicial estoppel.  Moreover, the safe harbor provision of 31 U.S.C. § 5318(g)(3)(A) specifically exempts Defendants from liability under "any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement) . . . ." 31 U.S.C.A. § 5318(g)(3)(A) (West 2009).  Plaintiff's state law claims are inextricably linked to the protected disclosures made to the FBI, which in turn led to forfeiture of the safe-deposit box.  And, as determined in the forfeiture proceeding, any items contained in the safe-deposit box were subject to forfeiture based on Plaintiff's criminal conviction.  Thus, Defendants are entitled to summary judgment on Plaintiff's state law claims.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

(1) Plaintiff's Motion to Strike is **DENIED**;

(2) Defendants' Motion for Summary Judgment is **GRANTED**;

(3) Plaintiff's Motion for Summary Judgment is **DENIED**; and,

(4) this case is **CLOSED**.

DATED this 29th day of January, 2010.

BY THE COURT:

*[signature]*

_____
CLARK WADDOUPS
United States District Judge